# EXHIBIT "A"

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed*****
Apr 28 2021 02:44PM
Latasha White
No. CI-21-00945

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION

FELICIA CHAVANNE,          :
    Plaintiff,              :          No. CI-21-00945
                            :
    v.                      :
                            :
ERIE INSURANCE             :
SECOND LOOK, INC., and     :
BARRY LEFEVER              :
    Defendants.             :

## NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

Lancaster Bar Association
Lawyer Referral Service
28 East Orange Street
Lancaster, Pennsylvania 17602
Telephone:   (717) 393-0737

CI-21-00945

By:   ___/s/ Ian R. Brinkman___

Date:   4/28/2021

Ian R. Brinkman, Esquire
Donald H. Hess, Esquire
*Attorneys for Plaintiff*
2933 Lititz Pike
PO Box 5349
Lancaster, PA 17606
717-291-1700
Sup. Ct. Atty. ID #327665
Sup. Ct. Atty. ID #52067

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION

FELICIA CHAVANNE,                    :
    Plaintiff,                       :         No. CI-21-00945
                             :
    v.                               :
                             :
ERIE INSURANCE                       :
SECOND LOOK, INC., and               :
BARRY LEFEVER                        :
    Defendants.                      :

## COMPLAINT

1.      Plaintiff is Felicia Chavanne, an adult individual, with an address of 48 Harvest Road, Lancaster, Pennsylvania 17602.

2.      Defendant is Erie Insurance ("Erie"), a Pennsylvania corporation, with an address of 100 Erie Insurance Place, Erie, Pennsylvania 16530.

3.      Defendant is Second Look, Inc. ("Second Look"), a New York corporation, with an address of 360 Motor Parkway, Suite 500, Hauppauge, New York, 11788.

4.      Defendant is Barry Lefever ("Lefever"), an adult individual, with an address of 111 Laurel Drive, Quarryville, PA 17566.

5.      Plaintiff entered into a lease agreement with Defendant Lefever for the rental of a residential living space (the "Lease"), which was located at 36 Harvest Road, Lancaster, Pennsylvania 17602 (the "Property"), so that she, her boyfriend, two sons, and mother could all have a place to stay together. A copy of the lease is attached hereto and incorporated herein as Exhibit "A."

6.      Through the course of Plaintiff's tenancy, she asked Lefever to repair various defects in the Property, including electrical issues involving the cooking stove in the kitchen, which she had asked to be remedied several times.

7.      Lefever hired a repair man to attempt to fix the stove on three (3) separate occasions.

8.      On at least one occasion during this period, when Plaintiff went to use the stove, she was struck by an intense, powerful electric shock that emanated from somewhere around the burner knob on the stove.

9.      As a result of the shock from the defective stove, Ms. Chavanne suffered injuries to her arm, which required her to attend ongoing physical therapy, and has left her with weakness in that area of her body to this day.

10.      Although Plaintiff provided notice to Lefever of the need to repair the cooking stove, Lefever failed to have the stove effectively repaired, and, when Lefever's repairman shorted one of the stove's elements, Lefever stated to Plaintiff that merely three (3) working burners were sufficient to adequately serve a family of five (5).

11.      After the above incidents and Lefever's refusal to remedy the stove's defects, on or about May 1, 2019, a fire broke out in the kitchen, around the area of the cooking stove, which caused damage to the Property, injury to Plaintiff's school-aged son and the family cat, and the ruining of much of the family's belongings.

12.      Ms. Chavanne witnessed her son's harrowing escape from the fire, the smoke from which proliferated throughout the house, so much so that the family's cat needed resuscitation by the responding fire crew, and much of the personal contents of the home were impacted by smoke damage, which included household goods, clothing, bedding, and other personal effects from the mundane to the precious.

13.      Because the fire rendered the Property uninhabitable, Plaintiff and her family stayed with relief services for a few days, and then paid out of pocket to stay at a hotel until Plaintiff could find suitable, permanent housing for her family.

14.     Beyond the physical and financial impact, losses to her family, and the resultant disruption of Plaintiff's life, the fire caused Ms. Chavanne a great deal of pain, suffering, and emotional distress.

15.     Starting with the electrical shock from the stove, which still leaves Plaintiff's arm in a weakened state, and then living through the day of the fire, has caused Plaintiff physical pain and ongoing suffering as well as emotional stress and anguish, fearing for her family's safety, particularly her young children and elderly mother.

16.     If the initial events were not impactful enough, Plaintiff and her family then had to live through the hardships of transient living after being made homeless by the fire, not feeling a practical and emotional sense of normalcy until finding permanent housing.

17.     The months after the fire were a tear-filled and fearful time for Plaintiff, a period of her life that she will never forget, and which she thought was behind her.

18.     On or about February 11, 2020, Defendant Erie sent a letter to Plaintiff (the "Erie Letter") listing: an ERIE Claim Number—A00001789023; ERIE Insured—Barry Lefever; Loss Date—05/01/19; and **Amount of Loss—$61,087.63**. A true and correct copy of the Erie Letter is attached hereto and incorporated herein by reference as Exhibit "B."

19.     The Erie Letter stated that Erie had settled a claim for damage to its insured's (Defendant Lefever) property (the Property) and that it had the right of recovery against Plaintiff "as a result of the above loss," presumably the Amount of Loss, on the Loss Date, to Lefever (the "Debt"). *See* Erie Letter.

20.     The Erie Letter continued, asking Plaintiff for her insurance information, and, if she had none, to contact Erie "urgent[ly]...to discuss restitution for this loss." *Id.*

CI-21-00945

21.     If Plaintiff failed to contact Erie's Subrogation Specialist Lynn Harris, the letter threatened that "we will file suit, which may result in additional costs to you." *Id.*

22.     The Erie Letter does not give any indication of the type of loss or to what property; the Erie Letter does not give any indication that the Debt is subject to change or that it is contestable; the Erie Letter does not state how the Debt was derived or how it might be verified; and the Erie Letter does not provide any timeline for when the actions demanded must occur before the threats made will be realized and intendent injury suffered.

23.     In response to Ms. Chavanne receiving the dunning Erie Letter, she became upset because the letter reinvigorated the painful and traumatic feelings she associated with the events surrounding the fire and seeing her family suffer and her life turned into upheaval.

24.     Plaintiff did not exactly understand the letter, and up until this point, she was not accustomed to dealing with these types of matters or the world of insurance or debt collection.

25.     What she did understand was that the Erie Letter was from an insurance company and involved her old landlord, but not why it would be sent to her, as the fire was not her fault, or why either the insurance company or Lefever would try to collect this Debt from her.

26.     Plaintiff understood that the losses and claims referred to in the Erie Letter were a debt, just not one that she felt that she owed.

27.     Not knowing exactly what to do with the Erie Letter, or its import as to Plaintiff's involvement at least, she set it aside reasoning that she had been around the block more than a few times and that nothing like this had ever happened to her, and the Erie Letter and the Debt claimed therein must be a mistake.

28.     Less than two (2) months after receiving the Erie Letter, on or about April 10, 2020, Ms. Chavanne received a second letter, this time from Defendant Second Look (the "Second Look

Letter"). A true and correct copy of the Second Look Letter is attached hereto and incorporated herein by reference as Exhibit "C."

29.     The Second Look Letter listed the following: Client—Erie Insurance; Account #—A00001789023; Our Control #—1612400; Date of Loss—05/01/19; and **Amount of Claim—$70,232.63**.

30.     The Second Look Letter stated that Second Look's client Erie Insurance "paid the above amount to their insured and therefore has subrogation rights to the extent of their payment." *See* Second Look Letter.

31.     This time, the Second Look Letter provided slightly more information than the Erie Letter, continuing, "Since our investigation of the claim indicates that their insured was not at fault, we feel that it is reasonable to <u>expect you, the liable party, to **pay for these damages**</u>." *Id* (emphasis added).

32.     Like the Erie Letter, the Second Look Letter again asked for Plaintiff's insurance information, and, if she had none, to immediately contact Second Look's Subrogation Representative "to discuss all available payment options in order to resolve this claim." *Id.*

33.     The Second Look Letter does not give any indication of the type of loss or to what property; the Second Look Letter does not give any indication that the Debt is subject to change or that it is contestable; the Second Look Letter does not state how the Debt was derived or how it might be verified; the Second Look Letter does not explain how the insured's lack of responsibility necessitates Plaintiff's liability; and the Second Look Letter does not provide any timeline for when the actions demanded must occur before the threats made will be realized and intendent injury suffered.

34.    Ms. Chavanne, understandably, responded to the Second Look Letter with increased concern given the heightened language in the Second Look Letter describing the Debt now as a claim for which Plaintiff is liable after an investigation, and the increase in the Debt from $61,087.63 to $70,232.63—a fifteen percent (15%) jump.

35.    Where Plaintiff thought the Erie Letter might be a mistake, she now saw the above escalations in the Second Look Letter as something that must be taken seriously.

36.    Of course, the Second Look Letter again brought about those difficult memories in Ms. Chavanne, taking her back to the fire and the trials it put her and her family through.

37.    After receiving the Second Look Letter, Ms. Chavanne, this time, sought the advice of her driving companion, an Amish gentleman she often gives rides to, who she thought knew a little more about the details of these types of issues—Ms. Chavanne understands insurance companies and debts, but not the complicated world of subrogation or even the meaning of that word itself.

38.    He agreed that the Second Look Letter made things appear to be 'real' and that Plaintiff should retain and seek the advice of an attorney, her current counsel, as to what to do.

39.    Plaintiff felt that if the Erie Letter was some type of warning or mistake, that the Second Look Letter was 'a deal breaker' and that she would need a lawyer to understand, respond to, and if necessary, defend against the claims and demands for satisfaction of the Debt in both the Erie Letter and Second Look Letter.

40.    Plaintiff, again, thought that she was smart enough to know she needed professional help but not smart enough to respond to and negotiate with Defendants Erie and Second Look herself.

41.    Looking at the Second Look Letter, Plaintiff saw that it not only doubled down on the allegations in the Erie Letter, but also added to the bare assertions in the Erie Letter that now Ms. Chavanne was responsible for damages to the property, a conclusion rendered as the result of an

investigation, and that Ms. Chavanne was the liable party that needed to discuss payment options to satisfy the Debt.

42.     Of particular concern of and confusion to Ms. Chavanne was the sudden precipitous increase in the Debt from the Erie Letter to the Second Look Letter, which skyrocketed from $61,087.63 to $70,232.63—a fifteen percent (15%) increase in less than two (2) months.

43.     This time, Ms. Chavanne retained counsel to interpret what the Erie Letter and Second Look Letter meant, confirm if they could put Ms. Chavanne in legal jeopardy if the allegations contained therein were true, and to verify if the increase in the Debt was valid.

44.     Ms. Chavanne, in her retention of counsel, sought explanation and understanding from Defendants Erie and Second Look, something she thought she could not do on her own.

45.     To attempt to better understand the claims and allegations made in the Erie Letter and Second Look Letter, and the substantial increase of the Debt alleged in each, Plaintiff's counsel sent both Erie and Second Look correspondence asking that all further communications be sent to Plaintiff's counsel and to please verify the nature and character of the Debt and how it increased by 15% in less than two (2) months (the "Plaintiff's Letter"). A true and correct copy of Plaintiff's Letter is attached hereto and incorporated herein by reference as Exhibit "D."

46.     Plaintiff incurred these fees for counsel's time in reviewing and analyzing the letters, corresponding with Defendants Erie and Second Look, and researching the issues that arose therefrom—it was not until that the request for a meeting of the minds revealed incomplete answers that Plaintiff did instruct her counsel to file the underlying action which is the basis of this Complaint and to start to incur separately attributable fees thereunder.

47.     Even though Plaintiff, through her counsel, sought to verify the Debt underlying the claims made by Erie and Second Look and its increase, Plaintiff received no further, meaningful

CI-21-00945

communications from Erie or Second Look until sometime after she secured the judgment against Erie and Second Look in magistrate district court, which underlies this complaint.

48.     On December 18, 2020, Ms. Chavanne filed a complaint with the Magisterial District Justice (the "Complaint"). A true and correct copy of the Complaint is attached hereto and incorporated herein by reference as Exhibit "E."

49.     The Magisterial District Justice granted judgment in favor of Ms. Chavanne in the amount of $12,000.00, plus costs (the "Judgment"). A true and correct copy of the Judgment is attached hereto and incorporated herein by reference as Exhibit "F."

50.     To date, Defendants Erie and Second Look have failed to satisfy the monetary judgment.

51.     On or about February 18, 2020, Defendants Erie and Second Look appealed this decision to the Court of Common Pleas.

52.     As of the date of the filing of this Complaint, Defendants Erie and Second Look have failed to conform to the rules and regulations surrounding the actions of debt collectors.


**COUNT I**
**Fair Debt Collection Practices Act, 15 U.S.C. 15 U.S.C. § 1692 et seq (FDCPA)**
**PLAINTIFF v. DEFENDANTS ERIE and SECOND LOOK**

53.     Paragraphs 1 through 52 are hereby incorporated by reference.

54.     To establish a violation of the FDCPA, a plaintiff must show that: (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Barbato v. Greystone All., LLC*, 916 F.3d 260, 265 (3d Cir. 2019).

55.     Plaintiff is a natural person who was the subject of an alleged obligation to pay money, namely the Debt. *See* Erie Letter and Second Look Letter.

56.     Defendant Second Look is a debt collector because it is a person who is either in the business the principle purpose of which is the collection of any debts or who regularly collects or attempts to collect debts owed or due or asserted to be due another, here Defendant Erie, as evidenced by Second Look's overall business structure and contractual relationship with Erie and similar companies.

57.     Defendant Erie, while likely a creditor under the FDCPA, falls under an exception to the definition of creditor, rendering it a debt collector under Section 1692a(1), when, in the course of collecting its own debts, it used Second Look's name, which indicated that a third person is collecting or attempting to collect such debts.   *Vincent v. The Money Store*, 736 F.3d 88, 96 (2d Cir. 2013).

58.     Defendants Erie and Second Look attempted to collect a debt when they sent Ms. Chavanne letters claiming that she had an alleged obligation to pay money, the Debt, arising out of her lease of the Property, which was a transaction involving property or services for primarily family and household purposes. *Joella v. Cole*, 221 A.3d 674 (2019) ("Subrogation is an equitable doctrine intended to place the ultimate burden of a **debt** upon the party primarily responsible for the loss."); *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 389–90 (5th Cir. 2002); *Jones v. Nationwide Prop. and Cas. Ins. Co.*, 32 A.3d 1261, 1270 (Pa. 2011).

59.     Finally, Erie's and Second Look's actions violated several provisions of the FDCPA.

60.     The violations arose out of two deficiencies on the part of Erie and Second Look: 1. a failure to communicate, and 2. the increase in the amount of the Debt claimed to be owed.

61.     First, the FDCPA prescribes that written communications attempting to collect a debt must contain notices that such a communication is an attempt to collect a debt by a debt collector. *See* 15 U.S.C. § 1692e(11).

62.     Second, the FDCPA prescribes that within five (5) days of the initial communication in connection with collection of any debt, a debt collector must send the consumer a written notice of the ability to dispute the debt and if the debt is disputed, that the debt collector will obtain verification of the debt and a copy of the verification will be mailed to the consumer. 15 U.S.C. § 1692g(a)(3) & (4).

63.     As evidenced by Exhibit D, the Second Look Letter is devoid of any language stating that either Defendant is a debt collector, that the debt may be disputed, or that the debt is verifiable or a separate verification document and no further communications with Defendants Erie or Second Look offered to verify or verified the Debt.

64.     Finally, and most alarmingly, between the Erie Letter and Second Look Letter, Second Look, with the permission of Erie, increased the Debt claimed to be owed from $61,087.63 to $70,232.63—a fifteen percent (15%) difference.

65.     Such an increase, with no explanation in the Second Look Letter, nor in the failed follow-up communications to Ms. Chavanne's counsel's letter seeking verification of the Debt, violated the most basic provisions in the FDCPA forbidding false or misleading representations concerning debt, including the amount, sought to be collected. 15 U.S.C. §§ 1692e(2)(A), (B), 1692e(10); *Echols v. Premiere Credit of N. Am., LLC*, No. CV 19-4125, 2021 WL 426737, at *1 (E.D. Pa. Feb. 8, 2021).

66.     As a result of the above several violations of the FDCPA, Ms. Chavanne suffered monetary damages in consulting with her attorney in order to interpret the Erie and Second Look

CI-21-00945

Letters, develop a response to the letters, communicate with Defendants Erie and Second Look in order to verify the Debt, and resolve the allegations against Plaintiff.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendants Erie and Second Look in the minimum amount of actual damages of $1,900, statutory damages of $1,000, plus interest, costs, and reasonable attorneys' fees; which amount does not exceed the amount for mandatory arbitration.

**COUNT II**
**Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.4**
**(FCEUA)**
**PLAINTIFF v. DEFENDANTS ERIE and SECOND LOOK**

67.     Paragraphs 1 through 66 are hereby incorporated by reference.

68.     The FCEUA prohibits certain unfair or deceptive acts or practices with regard to the collection of debts and applies to both debt collectors and creditors as defined therein. 73 P.S. § 2270.2.

69.     Under the FCEUA, a debt collector that violates any provision of the FDCPA automatically violates the FCEUA. 73 P.S. § 2270.4(a).

70.     Also, under the FCEUA, a creditor commits a violation when it uses "any false, deceptive, or misleading representation or means in connection with the collection of any debt, including the false representation of the character, amount or legal status of any debt." 73 P.S. § 2270.4(b)(5).

71.     As a creditor, Defendant Erie violated provisions of the FCEUA because as a person to whom a debt is alleged to be owed it committed deceptive or misleading debt collection practices when it transmitted the Erie Letter to Ms. Chavanne and then caused Second Look to transmit the Second Look Letter to Ms. Chavanne with the 15% increase in the Debt demanded.

CI-21-00945

72.     Erie further violated the FCEUA when it failed to allow Plaintiff to contest or verify the Debt.

73.     Furthermore, the FCEUA defines creditor as also including any of a creditor's agents that conduct business under the name of a creditor. 73 P.S. § 2270.3.

74.     Because Second Look is Erie's agent and acted under Erie's name, as evidenced by the Second Look Letter, Second Look is also liable for violating the FCEUA as a creditor for transmitting the Second Look Letter which contained the increase in the Debt demand.

75.     As explained under Count I, Defendant Second Look committed several violations of the FDCPA in the transmission of the Second Look Letter to Ms. Chavanne and its failure to verify the Debt it alleges Ms. Chavanne owes Erie, violating the FCEUA.

76.     In addition to this increase in the Debt between the Erie Letter and Second Look Letter, Erie committed the same violations of the FDCPA also resulting in violations of the FCEUA.

77.     If it were not for Erie's and Second Look's independent violations of the FCEUA and cross-violations via the FDCPA, Plaintiff would not have incurred the actual damages that arose out of the consultation with her counsel regarding the communications by both Defendants and the claims and demands involving the Debt therein.

78.     The remedy for violations of the FCEUA are provided for under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S.§201-1 et seq.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendants Erie and Second Look in the minimum amount of treble the actual damages of $1,900 and statutory damages of $100, plus interest, costs, and reasonable attorneys' fees; which amount does not exceed the amount for mandatory arbitration.

CI-21-00945

## COUNT III
### Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S.
### §201-1 et seq. (UTPCPL)
### PLAINTIFF v. DEFENDANTS ERIE and SECOND LOOK

79. Paragraphs 1 through 78 are hereby incorporated by reference.

80. The UTPCPL provides a person with a private cause of action who leases goods or services primarily for family or household purposes and suffers any ascertainable loss because of the use or employment of methods or acts declared unlawful by the UTPCPL. 73 P.S. § 201-3; *Grimes v. Enter. Leasing Co. of Philadelphia, LLC*, 105 A.3d 1188, 1190 (2014).

81. Ms. Chavanne leased the Property for primarily family and household purposes, to live with her family.

82. After the fire, when Defendants Erie and Second Look attempted to collect the Debt from Ms. Chavanne, they violated the UTPCPL by engaging in fraudulent and deceptive conduct which created a likelihood of confusion or misunderstanding by, in the Erie Letter and Second Look Letter, not affording Plaintiff the opportunity to challenge or verify the Debt, failing to verify the Debt upon demand, and for increasing the Debt by 15% in two months without explanation. *Stephens v. Omni Ins. Co.*, 138 Wash. App. 151, 166, 159 P.3d 10, 18 (2007), *aff'd sub nom. Panag v. Farmers Ins. Co. of Washington*, 166 Wash. 2d 27, 204 P.3d 885 (2009).

83. As the result of Erie's and Second Look's violations of the UTPCPL, Ms. Chavanne incurred a loss of money when she sought counsel for interpretation of the Erie Letter and how the demands for restitution of debt made therein interacted with her own claims that arose out of the fire against Defendant Lefever as landlord and subsequently to interpret the Second Look Letter and attempt to understand the demands being made therein, verify the alleged Debt owed, and determine

how the increase in the Debt occurred or if it was legitimate at all. 73 P.S. § 201-2(4)(xxi); *In re Marshall*, 613 B.R. 194, 216 (Bankr. E.D. Pa. 2020).

84.     While not money or property, another loss certainly ascertainable to Ms. Chavanne is the pain and anguish caused by each correspondence with Erie and Second Look, her counsel, and any other person in regard to the events of the day of the fire, which were traumatic, harrowing, and life altering.

85.     Notwithstanding the above, a debt collector's or creditor's violation of the FCEUA is an automatic violation of the UTPCPL.

86.     As explained under Count II of this Complaint, both Defendants Erie and Second Look violated provisions of the FCEUA.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendants Erie and Second Look in the minimum amount of treble the actual damages of $1,900, plus interest, costs, and reasonable attorneys' fees; which amount does not exceed the amount for mandatory arbitration.

## COUNT IV
### Vicarious Liability
### PLAINTIFF v. DEFENDANT ERIE

87.     Paragraphs 1 through 86 are hereby incorporated by reference.

88.     Pennsylvania agency law recognizes that principals are responsible for the wrongs committed by their agents.

89.     When Erie hired Second Look to help it collect its Debt alleged to be owed by Ms. Chavanne, Erie entered into an agency relationship with Second Look, where Second Look agreed to perform certain debt collection acts as agent on behalf of its principal Erie.

CI-21-00945

90.     Second Look performed the above wrongful acts, as described in Counts I-III, in the scope of its agency relationship with Erie, and Erie had control over the amount of the Debt alleged in the Second Look Letter and the verification process of the Debt and is liable for Second Look's wrongful acts and misrepresentations as detailed throughout this Complaint.

91.     Furthermore, when Erie failed to respond to Plaintiff's attempts to verify the debt and the reason for the increase thereof, it ratified the actions of Second Look.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendant Erie in the minimum amount of $8,900, plus interest, costs and reasonable attorneys' fees; which amount does not exceed the amount for mandatory arbitration.

## COUNT V
### Negligence
### PLAINTIFF v. DEFENDANT LEFEVER

92.     Paragraphs 1 through 91 are hereby incorporated by reference.

93.     Defendant Barry Lefever ("Lefever") was Ms. Chavanne's landlord and lessor of the Property to Plaintiff. *See* Exhibit A.

94.     Under the terms of the Lease, the appliances, including the kitchen stove, belonged to Lefever, and he bore the obligation to maintain those appliances in a workable and safe condition.

95.     Plaintiff observed electrical problems with the stove and contacted Lefever to repair the stove.

96.     Lefever attempted to fix the stove at least three separate times.

97.     On one occasion during this time period, when Plaintiff went to use the stove, she received an electrical shock that injured her arm and resulted in physical therapy and decreased capabilities.

CI-21-00945

98.     Shortly before May 1, 2019, the day of the fire, Lefever came to the Property with a repairman.

99.     While the repairman worked with the stove's electrical elements, a bolt of electricity shot from the stove, rendering one of the stove's elements inoperable.

100.    Lefever did not replace or repair the stove element—he merely observed that Ms. Chavanne could make do with the remaining three stove-top elements.

101.    On or about May 1, 2019, the defective, unrepaired stove caught fire causing escape injuries to Plaintiff's son, smoke inhalation of the family cat, extensive damage to the Property and Plaintiff's possessions, and the costs of relocating and finding new housing.

102.    Lefever, through his gross negligence, caused the above damages and continuing emotional distress to Ms. Chavanne and her family.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendant in the minimum amount of $35,000, plus interest, costs, and fees; which amount exceeds the amount for mandatory arbitration.

### COUNT VI
### Implied Warranty of Habitability
### PLAINTIFF v. LEFEVER

103.    Paragraphs 1 through 102 are hereby incorporated by reference.

104.    In Pennsylvania, in every agreement for the lease of residential real estate the landlord impliedly warrants that the leased property is free from any defect which would deprive the lessee of the use of the property for its intended purpose—to provide a premises fit for human habitation.

105.    Lefever and Ms. Chavanne were in a landlord-tenant relationship as evidenced by the Lease.

CI-21-00945

106.   Lefever breached the warranty of habitability he owed to Plaintiff when he improperly, or failed to, repair the stove that caused the fire and injured Plaintiff, her family, and their property.

107.   After Plaintiff informed Lefever of the defective condition of the stove, Lefever had a duty to fix the stove to render the Property in a safe, sanitary, and habitable condition.

108.   Lefever's ineffective repairs to the stove included leaving at least one burner in a non-working condition.

109.   Working cooking implements, and safe, working major electrical systems and appliances that are provided for under the Lease are required for residential rental housing to be habitable.

110.   A stove which shoots sparks and has at least one non-working cooking element does not meet the habitability standard.

111.   After the stove was left in its defective condition by Lefever, a fire broke out in the area of the stove when it was not in use.

112.   Because Lefever's failure to fix the stove, after Plaintiff provided him notice, caused the subsequent fire, which rendered the kitchen unusable and required Plaintiff and her family to vacate the Property, Lefever further rendered the Property unfit for human habitation, breaching the warranty.

113.   The defective condition in the stove that Lefever failed to remedy resulted in injuries to Ms. Chavanne and her family, including, but not limited to, the destruction of the contents of the kitchen, smoke damage to the contents of the Property, smoke inhalation of the family cat, escape injuries to her son, the cost and expense of living out of hotels until Ms. Chavanne could find

CI-21-00945

permanent housing for her and her family, and the pain, suffering, and mental anguish that accompanied these events.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendant in the minimum amount of $35,000, plus interest, costs, and fees; which amount exceeds the amount for mandatory arbitration.

**COUNT VII**
**Negligence**
**PLAINTIFF v. DEFENDANT ERIE**

114.    Paragraphs 1 through 113 are hereby incorporated by reference.

115.    When an insurance company pays its insured for covered losses and then seeks to recover the money payed to its insured from the party responsible for those losses, the insurance company steps into the shoes of the insured as to the party from which it is seeking recovery. *Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 754 (Pa. Super. Ct. 1999).

116.    This subrogation is an equitable doctrine so that the stepping into the shoes of the insured puts the subrogee in the exact same position of the one to whose **rights and disabilities** are subrogated. *Id*.

117.    As evidenced by the Erie Letter and Second Look Letter, Defendant Erie is subrogee and Defendant Lefever is subrogor as to the claims, liabilities, and Debt that arose out of the fire.

118.    Lefever was Ms. Chavanne's landlord and lessor of the Property.

119.    Under the terms of the Lease, the appliances, including the kitchen stove, belonged to Lefever and he bore the obligation to maintain those appliances in a workable and safe condition.

120.    Plaintiff observed electrical problems with the stove and contacted Lefever to repair the stove.

121.    Lefever attempted to fix the stove at least three separate times.

CI-21-00945

122.    On one occasion during this time period, when Plaintiff went to use the stove, she received an electrical shock that injured her arm and resulted in physical therapy and decreased capabilities.

123.    Shortly before May 1, 2019, the day of the fire, Lefever came to the Property with a repairman.

124.    While the repairman worked with the stove's electrical elements, a bolt of electricity shot from the stove, rendering one of the stove's elements inoperable.

125.    Lefever did not replace or repair the stove element—he merely observed that Ms. Chavanne could make do with the remaining three stove-top elements.

126.    On or about May 1, 2019, the stove caught fire causing escape injuries to Plaintiff's son, smoke inhalation of the family cat, and extensive damage to the Property and Plaintiff's possessions.

127.    Lefever, through his gross negligence, caused the above damages and continuing emotional distress to Ms. Chavanne and her family.

128.    Defendant Erie is responsible for the damages caused by Defendant Lefever's gross negligence because Erie is Lefever's subrogee.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendant in the minimum amount of $35,000, , plus interest, costs, and fees; which amount exceeds the amount for mandatory arbitration.

### COUNT VIII
### Breach of Implied Warranty of Habitability
### PLAINTIFF v. DEFENDANT ERIE

129.    Paragraphs 1 through 128 are hereby incorporated by reference.

130.     In Pennsylvania, implied in every agreement for the lease of residential real estate the landlord impliedly warrants that the leased property is from any defect which would deprive the lessee of the use of the intended purpose, that is to provide a premises fit for human habitation.

131.     Lefever and Ms. Chavanne were in a Lefever-Tenant relationship as evidenced by the Lease. *See* Exhibit A.

132.     Lefever breached the warranty of habitability he owed to Plaintiff when he improperly, or failed to, repair the stove that caused the fire and injured Plaintiff, her family, and their property.

133.     After Plaintiff informed Lefever of the defective condition of the stove, Lefever had a duty to fix the stove to render the Property in a safe, sanitary, and habitable condition.

134.     Lefever's ineffective repairs to the stove included leaving at least one burner in a non-working condition.

135.     Working cooking implements, and safe, working major electrical systems and appliances that are provided for under the Lease are required for residential rental housing to be habitable.

136.     A stove which shoots sparks and has at least one non-working cooking element does not meet the habitability standard.

137.     After the stove was left in its defective condition by Lefever, a fire broke out in the area of the stove, when it was not in use.

138.     Because Lefever's failure to fix the stove, after Plaintiff provided him notice, caused the subsequent fire, which rendered the kitchen unusable and required Plaintiff and her family to vacate the Property, the Lefever further rendered the Property unfit for human habitation, breaching the warranty.

CI-21-00945

139.     The defective condition in the stove that Lefever failed to remedy resulted in injuries to Ms. Chavanne and her family, including, but not limited to, the destruction of the contents of the kitchen, smoke damage to the contents of the Property, smoke inhalation of the family cat, escape injuries, the cost of expense of living out of hotels until Ms. Chavanne could find permanent housing for her and her family, and the pain, suffering, and mental anguish that accompanied these events.

140.     Defendant Erie is responsible for the damages caused by Defendant Lefever's flagrant breach of the implied warranty of habitability because Erie is Lefever's subrogee.

WHEREFORE, Plaintiff requests this Court to give judgment to Plaintiff and against Defendant in the minimum amount of $35,000, plus interest, costs, and fees; which amount exceeds the amount for mandatory arbitration.

Respectfully Submitted:

GIBBEL KRAYBILL & HESS LLP

By:     /s/ Ian R. Brinkman

Date:   4/28/2021

Ian R. Brinkman, Esquire
Donald H. Hess, Esquire
*Attorneys for Plaintiff*
2933 Lititz Pike
PO Box 5349
Lancaster, PA 17606
717-291-1700
Sup. Ct. Atty. ID #327665
Sup. Ct. Atty. ID #52067

CI-21-00945

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

_/s/ Ian R. Brinkman_          _4/28/2021_
Signature of Attorney          Date

CI-21-00945

## **VERIFICATION**

I verify that the statements made in the foregoing Complaint which are within the personal knowledge of the undersigned, are true and correct, and as to facts based on the information of others, the undersigned, after diligent inquiry, believes them to be true.   And further, as to language and averments which may constitute legal conclusions, I sign this verification on the recommendation of my attorneys who advise that the allegations and language in the Complaint constituting legal conclusions are required legally to raise issues for resolution at trial, by the Court, or by continuing investigation and preparation for trial.   I understand some of these allegations may prove inappropriate after investigation and trial preparation are complete and I leave determination of these matters to my attorneys on their advice.

I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. §4904 relating to unsworn falsification to authorities.

Date: __3/11/21__                                  __Felicia Chavanne__
                                                                    Felicia Chavanne

CI-21-00945

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of April, 2021, I have caused a copy of the foregoing

to be served upon the following in the manner as indicated below.

Service by First Class Mail and Email, addressed as follows:

Richard J. Perr, Esquire
Kaufman Dolowich & Voluck, LLP
Four Penn Center
1600 John F. Kennedy Blvd.
Suite 1030
Philadelphia, PA 19103
*Counsel for Defendants*

GIBBEL KRAYBILL & HESS LLP

By: _____*/s/ Ian R. Brinkman*_____

Ian R. Brinkman, Esquire
Donald H. Hess, Esquire
*Attorneys for Plaintiff*
2933 Lititz Pike
PO Box 5349
Lancaster, PA 17606
717-291-1700
Sup. Ct. Atty. ID #327665
Sup. Ct. Atty. ID #52067

ENTERED AND FILED
CI-21-00945
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed***
Apr 28 2021 02:44PM
Latasha  White

CI-21-00945

# EXHIBIT A

CI-21-00945

# Residential Lease

Apartment-Condominium-House

By this agreement made and entered into on _Feb_ _4_ 20 _12_ herein referred to as Lessor, between _Barry Lefever_ herein referred to as Lessee and _Jean Chevarie_, _____ let us Chevarie _____ in the City Lessor leases to Lessee the premises situated at _36 Harvest Rd_ _Pa._ State of of _Lancaster_ _11602_ County of _____ and more particularly described as follows _____

together with all appurtenances, for a term of _2_ years, to commence on _Feb_ _4_ 20 _12_ and to end on _Feb_ _4_ 20 _12_ at _12_ o'clock _A_ m.

**1. Rent.** Lessee agrees to pay, without demand, to Lessor as rent for the demised premises the sum of _fourteen hundred_ Dollars ($ _1,400.00_ ) per month in advance on the _4_ of each calendar month beginning _Feb_ _4_ , 20 _12_ , at _36 Harvest_ , City of _Rd Lancaster_ , State of _Pa._ , or at such other place as Lessor may designate.

**2. Form of Payment.** Lessee agrees to pay rent each month in the form of one personal check, OR one cashier's check, OR one money order made out to _Barry Lefever_ .

**3. Late Payments.** For any rent payment not paid by the date due, Lessee shall pay a late fee in the amount of _Twenty five_ Dollars ($ _25,00_ ).

**4. Returned Checks.** If, for any reason, a check used by Lessee to pay Lessor is returned without having been paid, Lessee will pay a charge of _Thirty five_ Dollars ($ _35.00_ ) as additional rent AND take whatever other consequences there might be in making a late payment. After the second time a Lessee's check is returned, Lessee must thereafter secure a cashier's check or money order for payment of rent.

**5. Security Deposit.** On execution of this lease, Lessee deposits with Lessor _fourteen hundred_ Dollars ($ _4400.00_ ), receipt of which is acknowledged by Lessor, as security for the faithful performance by Lessee of the terms hereof, to be returned to Lessee, without interest, except where required by law, on the full and faithful performance by him of the provisions hereof.

**6. Quiet Enjoyment.** Lessor covenants that on paying the rent and performing the covenants herein contained, Lessee shall peacefully and quietly have, hold, and enjoy the demised premises for the agreed term.

**7. Use of Premises.** The demised premises shall be used and occupied by Lessee exclusively as a private single family residence, and neither the premises nor any part thereof shall be used at any time during the term of this lease by Lessee for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family residence. Lessee shall comply with all the sanitary laws, ordinances, rules, and orders of appropriate governmental authorities affecting the cleanliness, occupancy, and preservation of the demised premises, and the sidewalks connected thereto, during the term of this lease.

**8. Number of Occupants.** Lessee agrees that the demised premises shall be occupied by no more than _Six_ persons, consisting of _4_ adults and _2_ children under the age of _____ years, without the written consent of Lessor.

CI-21-00945



9. **Condition of Premises.** Lessee stipulates that he or she has examined the demised premises, including the grounds and all buildings and improvements, and that they are, at the time of this lease, in good order, repair, and a safe, clean and tenantable condition.

10. **Keys.** Lessee will be given ____2____ key(s) to the premises and ____0____ mailbox key(s). If all keys are not returned to Lessor following termination of lease, Lessee shall be charged ____Ten____ Dollars ($ __10.00__ ).

11. **Locks.** Lessee agrees not to change locks on any door or mailbox without first obtaining Lessor's written permission. Having obtained written permission, Lessee agrees to pay for changing the locks and to provide Lessor with one duplicate key per lock.

12. **Lockout.** If Lessee becomes locked out of the premises after management's regular stated business hours, Lessee will be required to secure a private locksmith to regain entry at Lessee's sole expense.

13. **Parking.** Any parking that may be provided is strictly self-park and is at owner's risk. Parking fees are for a license to park only. No bailment or bailee custody is intended. Lessor is not responsible for, nor does Lessor assume any liability for damages caused by fire, theft, casualty or any other cause whatsoever with respect to any vehicle or its contents. Snow removal is the responsibility of the vehicle owner. Any tenant who wishes to rent a parking space or garage must sign a Parking Space or Garage Rental Agreement.

14. **Assignment and Subletting.** Without the prior written consent of Lessor, Lessee shall not assign this lease, or sublet or grant any concession or license to use the premises or any part thereof. A consent by Lessor to one assignment, subletting, concession or license shall not be deemed to be a consent to any subsequent assignment, subletting, concession or license. An assignment, subletting, concession, or license without the prior written consent of Lessor, or an assignment or subletting by operation of law, shall be void and shall, at Lessor's option, terminate this lease.

15. **Alterations and Improvements.** Lessee shall make no alterations to the buildings on the demised premises or construct any building or make other improvements on the demised premises without the prior written consent of Lessor. All alterations, changes, and improvements built, constructed, or placed on the demised premises by Lessee, with the exception of fixtures removable without damage to the premises and movable personal property, shall, unless otherwise provided by written agreement between Lessor and Lessee, be the property of Lessor and remain on the demised premises at the expiration or sooner termination of this lease.

16. **Damage to Premises.** If the demised premises, or any part thereof, shall be partially damaged by fire or other casualty not due to Lessee's negligence or willful act or that of his employee, family, agent, or visitor, the premises shall be promptly repaired by Lessor and there shall be an abatement of rent corresponding with the time during which, and the extent to which, the leased premises may have been untenantable; but, if the leased premises should be damaged other than by Lessee's negligence or willful act or that of his employee, family, agent, or visitor to the extent that Lessor shall decide not to rebuild or repair, the term of this lease shall end and the rent shall be prorated up to the time of the damage.

17. **Dangerous Materials.** Lessee shall not keep or have on the leased premises any article or thing of a dangerous, inflammable, or explosive character that might unreasonably increase the danger of fire on the leased premises or that might be considered hazardous or extra hazardous by any responsible insurance company.

18. **Utilities.** Lessee shall be responsible for arranging for and paying for all utility services required on the premises, except that ____All____ shall be furnished by Lessor.

**21. Termination.** This Agreement and the tenancy hereby granted may be terminated at any time by either party hereto by giving to the other party not less than one full month's prior notice in writing.

**22. Insurance.** Lessor has obtained insurance to cover fire damage to the building itself and liability insurance to cover certain personal injuries occurring as a result of property defects or Lessor negligence. Lessor's insurance does not cover Lessee's possessions or Lessee's negligence. Unless the opt-out clause below is initiated by both Lessee and Lessor, Lessee must obtain a renter's insurance policy to cover damage or loss of personal possessions as well as losses resulting from Lessee's negligence.

Opt Out Clause:

4/12 BSL
FL _____ Lessee and Lessor must both initial and date here if the requirement that Lessee obtain renter's insurance is waived. If the requirement is waived, Lessee will not be required to obtain renter's insurance. Lessor's insurance policy does not cover damages or loss of Lessee's personal possessions as well as losses resulting from Lessee's negligence.

**23. Attorney's Fees.** The prevailing party in an action brought for the recovery of rent or other moneys due or to become due under this lease or by reason of a breach of any covenant herein contained or for the recovery of the possession of said premises, or to compel the performance of anything agreed to be done herein, or to recover for damages to said property, or to enjoin any act contrary to the provision hereof, shall be awarded all of the costs in connection therewith, including, but not by way of limitation, reasonable attorney's fees.

**24. Rules and Regulations.** Lessor's existing rules and regulations, if any, shall be signed by Lessee, attached to this agreement and incorporated into it. Lessor may adopt other rules and regulations at a later time provided that they have a legitimate purpose, not modify Lessee's rights substantially and not become effective without notice of

**25. Radon Gas Disclosure.** As required by law, (Landlord) (Seller) makes the following disclosure: "Radon Gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in every state. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**26. Lead Paint Disclosure.** "Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention."

**27. Additional Terms and Conditions.** Lessee will Maintain yard By Mowing Grass and Racking Leaves + Triming Bushes Plus Pay For Trash Removel

Other Terms  Any Damage to Walls or floors Lessee will Be Responabk for All Damage Except Normak where and tar

CI-21-00945

**36. Other Terms**  Any Damage to walls or floors
LESSEE will Be Responable For All Damage
Except Normal wear & tear

PA-30 717 836

**IN WITNESS WHEREOF,** the parties have executed this lease the day and year first written above.

× Harry Charanne

Lessor: Barry Lefever                    Lessee: Felicia Charanne

Lessor: Joan Charanne                    Lessee:

**NOTICE:** State law establishes rights and obligations for parties to rental agreements. This agreement is required to comply with the Truth in Renting Act or the applicable Landlord Tenant Statute or code of your state. If you have a question about the interpretation or legality of a provision of this agreement, you may want to seek assistance from a lawyer or other qualified person.

**NOTICE:** Contact your local county real estate board for additional forms that may be required to meet your specific needs.

CI-21-00945

# EXHIBIT B

CI-21-00945



**Erie Insurance**®

Home Office • 100 Erie Insurance Place • Erie, Pennsylvania 16530 • (814) 870-2000
Toll Free 1-800-458-0811 • Fax (814) 870-3126 • www.erieinsurance.com

February 11, 2020

Felicia Chavanne
48 Harvest Rd Apt 22
Lancaster, PA 17602-1172

Re: ERIE Claim        # A00001789023
ERIE Insured:     Barry Lefever
Loss Date:        05/01/19
Amount of Loss: $61,087.63

Dear Ms. Chavanne:

We have settled the claim for damage to our insured's property as a result of the above loss. Under the terms of our policy, we now have the right of recovery.

On the enclosed form, please list the name and address of your insurance company, your policy number, and the name of your agent. Please return the form in the enclosed self-addressed stamped envelope and report this directly to your insurance carrier, so that we can make direct contact with them.

If you are uninsured, it is urgent that you contact me at the phone number below to discuss restitution for this loss. If we do not hear from you, we will file suit, which may result in additional costs for you.

Sincerely,

Lynn Harris
Subrogation Specialist
724-772-7769

/HLH SC01
Enclosures:
    Envelope
    C-123 Form
cc: Barry Lefever
    AA7715: Community Insurance Services Inc
    File

CI-21-00945

# EXHIBIT C

CI-21-00945

# Second Look, Inc.

360 Motor Pky Ste 500  Hauppauge NY 11788

Phone: (844) 588-8078 Ext: 4042
Fax: (941) 404-4284

| OUR CLIENT | |
|---|---|
| ERIE INSURANCE | |
| ACCOUNT # | OUR CONTROL # |
| A00001789021 | 1612400 |
| DATE | DATE OF LOSS |
| April 10, 2020 | 05/01/19 |
| AMOUNT OF CLAIM | |
| $70,232.63 | |

Felicia Chavanne
48 Harvest Rd Apt 22
Lancaster PA 17602

## REQUEST FOR INSURANCE INFORMATION

Dear Felicia Chavanne

Our client paid the above amount to their insured and therefore has subrogation rights to the extent of their payment. Since our investigation of the claim indicates that their insured was not at fault, we feel that it is reasonable to expect you, the liable party, to pay for these damages.

If you carried liability insurance coverage on the above referenced date of loss, please complete the information below and return it to our office.

Your Insurance Company _____

Policy Number _____        Claim Number _____

Insurance Company Phone Number _____

Control# 1612400

If you did not carry liability insurance coverage on the above date of loss, it is important that you contact us immediately to discuss all available payment options in order to resolve this claim.

Sincerely,

James Poe
Subrogation Representative

# EXHIBIT D

CI-21-00945



THE LAW OFFICES OF

GIBBEL KRAYBILL & HESS LLP
ATTORNEYS & COUNSELORS AT LAW

May 13, 2020

Second Look, Inc.                           Erie Insurance
c/o James Poe                               c/o Lynn Harris
360 Motor Parkway, Ste 500                  100 Erie Insurance Place
Hauppauge, NY  11788                        Erie, PA  16530
941-556-4303                                724.772.7769
jpoe@2ndlook.net                            Lynn.Harris@ERIEinsurance.com

    Re:    Felicia Chavanne
                     Erie Claim:  # A00001789023
               Erie Insured:  Barry Lefever
                  Loss Date:  05/01/2019
        Amount of Loss:  $70,232.63

Dear James and Lynn:

Please be advised that we represent Ms. Chavanne and family in this matter.  Going forward, kindly communicate with me; do not contact Ms. Chavanne.

Ms. Chavanne received two letters (attached) one from Erie insurance dated February 11, 2020; the second from Second Look dated April 10, 2020.  This looks to me like a debt collection letter, but I don't see any of the required legends.  I wonder if you could advise how your demand increased from $61,087.63 to 70,232.63 in the matter of a few weeks.  Would you kindly provide me with documentation supporting the dollar amount of this demand?

Please clarify which of you is authorized to speak for Erie Insurance going forward?

Concerning the basis of your claim, I am most curious how you concluded the tenant is responsible for damages caused by this fire.  Please provide me any documentation that justifies your demand for reimbursement.

If you pursue this matter, you will soon discover several unsavory facts. Among them:

1.  The stove was off at the time of the fire.

2.  No one was in the kitchen when the fire broke out.

By Appointment Only:         W W W . G K H . C O M         2933 Lititz Pike
N. Duke Street · Lancaster                              PO Box 5349
Suburban Square · Ardmore    717  291  1700    484  416  0531    Lancaster, PA 17606

CI-21-00945

Second Look, Inc.
Erie Insurance
May 13, 2020
Page 2

3.  The fire was caused by a malfunctioning stove.

4.  Ms. Chavanne was injured by a severe electrical shock when she used the stove, requiring
    significant medical attention.  She continues regular physical therapy to restore strength
    in her arm.  She lost her strength as a direct result of the electrical shock.

5.  In the weeks before the fire, the landlord made three attempts to repair the stove.  During
    at least one of these efforts sparks were flying from the stove.

6.  The landlord never did repair the stove properly.  At the time of the fire only two of the
    four burners on the stove top functioned.  The landlord advised that two burners were
    sufficient for Ms. Chavanne's household which included four adults and two children.

I'm happy to discuss this matter for you at your convenience.

With warm regards.

Sincerely,

Enc:
Cc:     Client(s)

CI-21-00945

# EXHIBIT E

CI-21-00945

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF  Lancaster



# CIVIL COMPLAINT

Mag. Dist. No: 02-3-02
MDJ Name: B. Denise Commins
Address:     15 Geist Road
                   Lancaster, PA 17601-5993
Telephone: (717) 656-2191

PLAINTIFF:                                   NAME and ADDRESS

Felicia Chavanne
48 Harvest Road
Lancaster, PA 17602

DEFENDANT:         V.          NAME and ADDRESS

Erie Insurance and
Second Look, Inc.,
c/o James Poe

|   | AMOUNT | DATE PAID |
|---|---|---|
| FILING COSTS | $ 177.25 | |
| POSTAGE | $ NR | |
| SERVICE COSTS | $ | |
| CONSTABLE ED. | $ | |
| TOTAL | $ 177.25 | 12/18/20 |

Docket No: CV-166-20
Case Filed: 12/18/2020

Pa.R.C.P.M.D.J. No. 206 sets forth those costs recoverable by the prevailing party.

To The Defendant:  The above named plaintiff(s) asks judgment against you for $ 12,000.00     together with costs
upon the following claim (Civil fines must include citation of the statute or ordinance violated):

Defendants Erie Insurance and Second Look, Inc. sent Plaintiff two letters claiming that Plaintiff
owed Erie Insurance various sums for alleged losses suffered by Erie Insurance's insured. Because
both Defendant Erie Insurance and Second Look, Inc. alleged that Plaintiff owed a debt, they were
required to follow federal and state fair debt collection practice and unfair competition laws.
Defendant's letters violated Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq by making
false representations about the purpose of the letters and the amount allegedly owed. Defendants
further violated unfair competition laws for the same acts as set forth in the attached Appendix.

I,  Ian Brinkman, counsel for Plaintiff,      verify that the facts set forth in this complaint are true and correct to the
best of my knowledge, information, and belief.  This statement is made subject to the penalties of Section 4904 of the
Crimes Code (18 PA. C.S. § 4904) related to unsworn falsification to authorities.

I certify that this filing complies with the provisions of the Case Records Public Access Policy of the Unified Judicial System
of Pennsylvania that require filing confidential information and documents differently than non-confidential information and
documents.

_____
(Signature of Plaintiff or Authorized Agent)

The plaintiff's attorney shall file an entry of appearance with the magisterial district court pursuant to Pa.R.C.P.M.D.J. 207.1

**If you intend to enter a defense to this complaint, you should notify this office immediately at the above telephone number. You
must appear at the hearing and present your defense. Unless you do, judgment may be entered against you by default.**

If you have a claim against the plaintiff which is within the magisterial district judge jurisdiction and which you intend to assert at the
hearing, you must file it on a complaint form at this office at least five days before the date set for the hearing.

**If you are disabled and require a reasonable accommodation to gain access to the Magisterial District Court and its services,
please contact the Magisterial District Court at the above address or telephone number.  We are unable to provide
transportation.**

AOPC 308A                                                   1

FREE INTERPRETER
www.pacourts.us/language-rights

CI-21-00945

**Defendants' Information:**

Erie Insurance
100 Erie Insurance Place
Erie, PA 16530


Second Look, Inc.
c/o James Poe
360 Motor Parkway, Ste 500
Hauppauge, NY 11788

## **APPENDIX TO COMPLAINT**

**Facts**:

On or about May 1, 2019, the property of Defendant Erie Insurance insured allegedly suffered damage from a fire. Sometime thereafter, Defendant Erie settled a claim for damages that resulted from the alleged loss with its insured. On February 11, 2020, Defendant Erie sent a letter to Plaintiff stating that based on its settlement with its insured, Defendant Erie had a right of recovery against Plaintiff, indicating a loss of $61,087.63. (Exhibit A). The letter discussed restitution and if Plaintiff did not respond, threatened a law suit. On April 10, 2020, Defendant Second Look, Defendant Erie's agent, sent a letter to Plaintiff on behalf of Defendant Erie. (Exhibit B). The letter claimed that Defendant Erie had subrogation rights against Plaintiff, that Plaintiff was at fault for the alleged loss, that it owed payment for damages in the amount of $70,232.63, and that Plaintiff could contact Defendant Second Look for payment options to resolve the claim.

Based upon the above actions of Defendants Erie and Second Look, both violated several federal and state fair debt collection statutes and similar laws.

**Claims:**

**Violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq* (FDCPA)**

In transmitting Exhibit B to Plaintiff, Defendants directly, or through their agents, violated § 1692e(2)(A) of the FDCPA by falsely representing the character, amount, or legal status of the alleged debt as almost $10,000 more than the alleged loss listed in Exhibit A and naming Plaintiff as exclusively liable for the alleged claim.

In transmitting Exhibit B to Plaintiff, Defendants directly, or through their agents, violated § 1692e(2)(B) of the FDCPA by falsely representing services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt when Defendants increased the alleged claim amount by almost $10,000 over the alleged loss amount in Exhibit A.

In transmitting Exhibit B to Plaintiff, Defendants directly, or through their agents, violated § 1692e(11) of the FDCPA by failing to indicate in the initial/subsequent demands that Defendants were attempting to collect a debt, that information gathered would be used for that purpose, and that subsequent communications would be targeted at the same.

In transmitting Exhibit B to Plaintiff, Defendants directly, or through their agents, violated § 1692e(10) of the FDCPA by falsely representing the amount of the alleged debt owed to Defendant Erie in that the amount demanded in Exhibit A increased by almost $10,000.

In transmitting Exhibit B to Plaintiff, Defendant directly and through its agent, violated § 1692g(a)(3) and (4) by failing to provide a notice in its initial demand and subsequent demand that Plaintiff could dispute the debt, that Defendants would verify any disputed debt, and failing to verify the disputed debt upon demand of Plaintiff's counsel.

CI-21-00945

**Violations of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5531 (Dodd-Frank)**

In transmitting Exhibits A and B to Plaintiff, Defendants directly, or through their agents, violated § 5531 of Dodd-Frank when they characterized the alleged loss as caused by Plaintiff, as well as a definitive debt of Plaintiff, and changed the amount of the alleged debt of Plaintiff without cause, all of which amount to unfair and deceptive acts or practices.

**Violations of Pennsylvania's Fair Credit Extension Uniformity Act, 73 P.S. § 2270.4 (FCEUA)**

In transmitting Exhibits A and B to Plaintiff, Defendants directly, or through their agents, violated § 2270.4(a) of the FCEUA by violating the FDCPA, outlined above.

In transmitting Exhibits A and B to Plaintiff, Defendants violated § 2270.4(b)(5) of the FCEUA when they characterized a loss to Defendant Erie's insured as a debt of Plaintiff, stated two different amounts for the alleged debt, and insinuated Plaintiff was the cause of the loss, all of which constitute false, deceptive, and misleading representations or means of collecting a debt.

**Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq. (UTPCPL)**

In transmitting Exhibits A and B to Plaintiff, Defendants violated §201-3 of the UTPCPL by falsely representing the character, amount, and legal status of the alleged debt, all of which constitute unfair or deceptive acts or practices in the conduct of the trade of insurance and debt collection.

**Conclusion**:

As a result of Defendants' direct violations of the above debt collection and consumer protection laws and the use of a debt collection agency and/or Defendant Erie's agent Defendant Second Look to violate the same, Plaintiff has suffered direct damages including stress and embarrassment, and is also entitled to statutory damages as provided above and as this court sees fit.

CI-21-00945

# EXHIBIT F

CI-21-00945

# Magisterial District Judge 02-3-02

## DOCKET

Docket Number: MJ-02302-CV-0000166-2020

# Civil Docket



Felicia  Chavanne

v.

Erie Insurance, Second Look, Inc.

Page 1 of 2

### CASE INFORMATION

| | | | |
|---|---|---|---|
| Judge Assigned: | Magisterial District Judge B. Denise Commins | File Date: | 12/18/2020 |
| Claim Amount: | $12,000.00 | Case Status: | Closed |
| Judgment Amount: | $12,177.25 | County: | Lancaster |

### CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Civil Action Hearing | 01/22/2021 | 8:30 am | | Magisterial District Judge B. Denise Commins | Scheduled |

### CASE PARTICIPANTS

| Participant Type | Participant Name | Address |
|---|---|---|
| Defendant | Erie Insurance | Erie, PA 16530 |
| Defendant | Second Look, Inc. | Hauppauge, NY 11788 |
| Plaintiff | Chavanne, Felicia | Lancaster, PA 17602 |

### DISPOSITION SUMMARY

| Docket Number | Plaintiff | Defendant | Disposition | Disposition Date |
|---|---|---|---|---|
| MJ-02302-CV-0000166-2020 | Felicia Chavanne | Erie Insurance | Default Judgment for Plaintiff | 01/22/2021 |
| MJ-02302-CV-0000166-2020 | Felicia Chavanne | Second Look, Inc. | Default Judgment for Plaintiff | 01/22/2021 |

### CIVIL DISPOSITION / JUDGMENT DETAILS

**Disposition Date:** 01/22/2021          **Monthly Rent:** $0.00

| Defendant(s) | Plaintiff(s) | Disposition | Joint/Several Liability | Individual Liability | Net Judgment |
|---|---|---|---|---|---|
| Erie Insurance; Second Look, Inc. | Felicia Chavanne | Default Judgment for Plaintiff | $12,177.25 | $0.00 | $12,177.25 |

Judgment Components:

| Type | Amount | Deposit Amount | Adjusted Amount |
|---|---|---|---|
| *Civil Judgment | $12,000.00 | $0.00 | $12,000.00 |
| *Costs | $177.25 | $0.00 | $177.25 |

* Is Joint/Several

MDJS 1200

Printed: 01/22/2021  11:44 pm

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data , errors or omissions on these docket sheets.  You should verify that the information is accurate and current by personally consulting the official record reposing in the court wherein the record is maintained.

CI-21-00945

# Magisterial District Judge 02-3-02

## DOCKET

Docket Number: MJ-02302-CV-0000166-2020

### Civil Docket

Felicia  Chavanne

v.

Erie Insurance, Second Look, Inc.

Page 2 of 2

### ATTORNEY INFORMATION

**Complainant's Attorney**

<u>Name:</u>  Ian Ross Brinkman, Esq.

<u>Representing:</u>  Chavanne, Felicia

<u>Counsel Status:</u>  Active - Entry of Appearance

<u>Supreme Court No.:</u>  327665

<u>Phone No.:</u>  717-291-1700

<u>Address:</u>      Gibbel Kraybill & Hess Llp
              2933 Lititz Pk Po Box 5349
              Lancaster, PA  17606

<u>Entry of Appearance Filed Dt:</u>  12/18/2020

<u>Withdrawal of Entry of Appearance Filed Dt:</u>

### DOCKET ENTRY INFORMATION

| <u>Filed Date</u> | <u>Entry</u> | <u>Filer</u> | <u>Applies To</u> |
|---|---|---|---|
| 01/22/2021 | Default Judgment for Plaintiff | Magisterial District Court 02-3-02 | Erie Insurance, Defendant |
| 01/22/2021 | Default Judgment for Plaintiff | Magisterial District Court 02-3-02 | Second Look, Inc., Defendant |
| 01/22/2021 | Judgment Entered | Magisterial District Court 02-3-02 | Erie Insurance, Defendant |
| 01/22/2021 | Judgment Entered | Magisterial District Court 02-3-02 | Second Look, Inc., Defendant |
| 01/06/2021 | Certified Civil Complaint Accepted | Magisterial District Court 02-3-02 | Second Look, Inc., Defendant |
| 12/30/2020 | Certified Civil Complaint Accepted | Magisterial District Court 02-3-02 | Erie Insurance, Defendant |
| 12/21/2020 | Certified Civil Complaint Issued | Magisterial District Court 02-3-02 | Second Look, Inc., Defendant |
| 12/21/2020 | Certified Civil Complaint Issued | Magisterial District Court 02-3-02 | Erie Insurance, Defendant |
| 12/18/2020 | Entry of Appearance Filed | Ian Ross Brinkman, Esq. | Felicia Chavanne, Plaintiff |
| 12/18/2020 | Civil Complaint Filed | Felicia Chavanne | |

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assumes any liability for inaccurate or delayed data , errors or omissions on these docket sheets.  You should verify that the information is accurate and current by personally consulting the official record reposing in the court wherein the record is maintained.